MEMORANDUM OF DECISION
On September 5, 2000, the Department of Children and Families, (DCF) filed these coterminous petitions seeking an adjudication of neglect and a termination of parental rights of the biological parents of Chloe P., born on August 2000. Because a paternity test excluded the individual named as the biological father on this petition, on January 18, 2001, DCF filed a subsequent petition naming "John Doe" as the biological father. On February 7, 2001, the court, (Tanzer, J) consolidated the petitions. The trial on these petitions was held on October 25, 2001.
DCF alleges that Chloe is a neglected and uncared for child because her parents allowed her to live under conditions injurious to her well being as well as denied her proper care and attention. DCF further alleges that Chloe is an uncared for child because her home is unable to provide the specialized care that Chloe requires. General Statutes § 46b-120 (9) CT Page 14336 (B)(C) and (10) respectively.
As grounds for the termination of parental rights, DCF alleges that Lorie, the respondent mother, has failed, and is unable and unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering her daughter's age and needs, she could assume a responsible position in Chloe's life, and furthermore, that Lorie's parental rights to another child were previously terminated pursuant to a petition filed by DCF. General Statutes § 17a-112 (j)(3)(E). Regarding the unknown father, referred to as "John Doe", DCF alleges abandonment and no ongoing parent-child relationship. General Statutes § 17a-112 (3)(j)(A) and (D) respectively.
The court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. Although Lorie did not appear in court on the day of the trial, she was represented by her court appointed attorney. The respondent father did not appear and a default was entered. The court was presented with nineteen full exhibits and heard the testimony of the social worker. The court finds the following facts based on the direct evidence and reasonable and logical inferences drawn therefrom.
 I FACTS A. The Mother.
Lorie P., is thirty-two years old and the biological mother of four children. Two of her children are issue of a marriage that was dissolved in 1996. Those children are in the custody of their biological father[2]. On August 28, 1996, Lorie delivered Farrah, her third child. Her parental rights to Farrah were terminated on June 9, 2000.[3] On August 2000, Lorie delivered her fourth child, Chloe, the subject of this petition.
According to the evidence, Lorie dropped out of high school in the tenth grade after she contacted Encephalitis.[4] As a result of this condition, she has suffered from pain and lapse of memory since she was sixteen. On February 14, 1990, at the age of twenty-one, she married. She delivered her first child within five months of that marriage. Her second child was born sixteen months later. The social study states that as a result of conflicts and the use of drugs, the couple separated for a while and ultimately divorced on November 26, 1996. For a period of time during the separation from her husband, Lorie was romantically involved with Kevin K. CT Page 14337
On August 28, 1996, three months before her divorce was final, her relationship with Kevin produced a child; Farrah. Kevin was incarcerated at the time of Farrah's birth.[5] Nine months after her birth, on May 22, 1997, DCF obtained an Order of Temporary Custody regarding Farrah. She was removed from Lorie's care and custody and placed in foster care. During Farrah's stay in foster care, DCF attempted to work with Lorie to help her address the issues that caused the removal of her daughter. In a comprehensive and thorough decision[6], the court, (Shapiro, J.)
described the efforts made by DCF to reunite and rehabilitate Lorie. Unfortunately, those efforts were unsuccessful and on June 9, 2000, the court found that as a result of Lorie's failure to rehabilitate, it was in Farrah's best interest to terminate both of her parent's parental rights.
Three short months following the court's decision terminating her parental rights, Lorie delivered Chloe. The court file, of which this court has taken judicial notice, indicates that on August 30, 2000, DCF received a report from a hospital alleging neglect of a newborn. Upon investigation of the report, DCF learned that Lorie was on eighty milligrams of Methadone daily but used Heroin as well.[7] As a result, Chloe was experiencing symptoms of withdrawal, such as high pitched crying and severe diaper rash.[8] removed Chloe from her mother and placed her in foster care where she has remained.
At the time of the issuance of the OTC, the court provided Lorie with specific steps to take to facilitate a reunification with her daughter. Those steps included the following:
1. Keep all appointments set by or with DCF.
2. Keep your whereabouts known to DCF.
3. Participate in Parenting, Individual and Family counseling.
4. Submit to substance abuse assessment and follow recommendations for treatment.
5. Submit to Random drug testing.
6. The recommended service providers were the Family Services Center and CMHA.
7. Cooperate with court ordered evaluations.
8. Sign releases authorizing DCF to communicate with service providers. CT Page 14338
9. Secure and maintain adequate housing and legal income.
10. No substance abuse.
11. No further involvement with the criminal justice system.
12. Visit Chloe as often as DCF permits.
The evidence clearly and convincingly establishes that Lorie did not comply in any meaningful way with any of the specific steps. Unfortunately for Lorie, her struggle with drug addiction has dominated much of her adult life. Despite her half-hearted attempts to obtain sobriety, she has been unable to do so. To her credit, on November 30, 2000, she participated in a substance abuse evaluation.[9] In that evaluation, she admitted that she was addicted to heroin, using it as recently as two weeks prior to that assessment. She also expressed an interest in attending a treatment program. As a result of the conclusions reached by the evaluator, a partial hospital program consisting of five days per week for six weeks was recommended for Lorie. However, due to the program's inability to contact her to schedule appointments, as well as her failure to attend the appointments that were made for her, on January 4, 2001, she was discharged from the program.[10]
Notwithstanding her Jack of cooperation with the drug treatment program, Lorie was trying to address her addiction. According to the evidence, she sought emergency medical attention for detoxification from cocaine on at least one occasion.[11] On April 20, 2001, she called an ambulance to take her to the hospital stating that "she had used cocaine approximately one hundred times in the last four days."[12]
On this date, the evidence reveals that Lorie was arrested and charged with possession of narcotics. According to the report of her criminal record, this case was still pending as of August 9, 2001, the date that the criminal report was generated.[13] It is noteworthy that Lorie's criminal record lists ten arrests with the first one occurring on May 13, 1997. As a result of those arrests and subsequent convictions, Lorie has been sentenced to periods of probation as well as periods of incarceration. Many of the arrests involved illegal drugs. As a further example of this, the court was provided with a copy of a police department incident report describing an arrest that took place on June 24, 2001.[14]
According to the report, on that date, Lorie was a passenger in a motor vehicle that was stopped by the police.[15] The police searched the vehicle and found hypodermic needles. Lorie admitted to the police that CT Page 14339 "she was trying to get off heroin and that she shoots cocaine.'[16] She was arrested for possession of drug paraphernalia.
The court is not encouraged nor convinced that, given this extensive history of unsuccessful and half-hearted attempts at rehabilitation, Lorie could, within a reasonable time,
B. The Father
Unfortunately for little Chloe, her biological father has not been identified, nor has anyone come forward claiming to be her father. A paternity test excluded the putative father, requiring service of process, by publication, on the biological father using the common appellation of "John Doe." The biological father has had no contact whatsoever with Chloe since her birth.
C. Chloe
Chloe is a fourteen month old baby that has been in foster care since her birth. Fortunately for Chloe, she has been able to overcome the challenge with which she was confronted at birth, withdrawal from drugs. According to the evidence, "Chloe is . . . a healthy baby and is on target or ahead in all developmental areas."[17] Despite her removal from her mother at birth and placement in a foster home followed by a subsequent move and placement in what is her current foster home, Chloe has been able to form a healthy attachment to her current care givers.
On February 19, 2001, David M. Mantell, PhD, the court appointed evaluator, performed a psychological evaluation of Lorie and an interactional assessment with Chloe. Dr. Mantell's findings are contained in his report dated February 26, 2001.[18] Dr. Mantell concluded that despite the fact "that mother was thoroughly appropriate with Chloe . . . [t]here is no evidence of a relationship between the mother and the child."[19] Certainly, Lorie's lack of contact with her daughter for almost a year has contributed significantly to the lack of a parent child relationship.
Laura Hosmer, the DCF social worker assigned to this case, testified that Lorie's last visit with her daughter was on November 30, 2000. Ms. Hosmer has been working with this family since November 20, 2000. She explained to the court "that Lorie did not want to get too attached to Chloe." She did not request frequent visitation, nor did she call DCF to inquire of her daughter's well-being. The last interaction that she has had with her daughter was on the day of the court ordered interactional assessment, February 19, 2001. CT Page 14340
 II NEGLECT ADJUDICATION
In hearing coterminous petitions for neglect and termination, the court "first determines whether the child is neglected, uncared for or dependent by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence." Practice Book(Rev. 1999) § 33-12.
Since Chloe was never in Lorie's care, any adjudication of neglect would necessarily be based on predictive neglect. "Our statutes clearly permit an adjudication of neglect based on a potential for harm or abuse to occur in the future . . . By its terms, § 17a-101 (a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place." In re Michael D., 58 Conn. App. 119, ___ A.2d ___ (2000).
In accordance with the statutory requirements and the case law, the court finds by a fair preponderance of the evidence that Lorie would have neglected Chloe by allowing her to live under conditions injurious to her well being as well as by denying her proper care and attention, as that term is defined in our statutes. In addition, the court further finds, by a preponderance of the evidence that at the time of the filing of the petition, Chloe had specialized needs which her home could not meet. The court adjudicates Chloe a neglected and uncared for child.
 III TERMINATION ADJUDICATION A. Reasonable Efforts
DCF alleges that Lori and John Doe are unable to or are unwilling to benefit from reunification efforts. General Statutes § 17a-112 (j) (1) requires the court to find "by clear and convincing evidence that DCF has made reasonable efforts to locate the parents and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of § 17a-110 or § 17a-111b
that such efforts are not appropriate." CT Page 14341
The court finds that a multitude of services have been made available to Lorie since her first involvement with DCF. Notwithstanding the fact that just three months prior to delivering Chloe, the court in Farrah's case had found Lorie unwilling and unable to benefit from reunification services, DCF attempted to provide additional services to Lorie. The evidence demonstrates that she was once again referred for substance abuse evaluations and for treatment. She was also provided with a visitation schedule as well as transportation services. Lorie, however, would not engage in the process of reunification. The court finds, by clear and convincing evidence, that Lorie is unable and unwilling to benefit from any reunification services.
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the biological father. At the time of Chloe's birth, Lorie identified her boyfriend as the biological father. A paternity test, however, excluded this individual. Lorie then identified someone named David as the biological father. She does not know his last name nor does she know his address. As a result, DCF has been unable to make reasonable efforts to locate the father. Since the biological father has not come forward nor has he been identified, the court finds by clear and convincing evidence, that he is unable and unwilling to benefit from reunification services. After all, he has never even been willing to acknowledge that he is Chloe's father.
 B. Termination Adjudication 1. As to Lorie
The court finds by clear and convincing evidence that Lorie has failed, and is unable and unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering her daughter's age and needs, she could assume a responsible position in Chloe's life, and that Lorie's parental rights to another child were previously terminated pursuant to a petition filed by DCF. General Statutes § 17a-112 (j)(3)(E).
 2. As to John Doe
The court finds by clear and convincing evidence that Chloe has been abandoned by her biological father as that term is defined under the statute. The court further finds by clear and convincing evidence that Chloe does not have an ongoing parent-child relationship with her father. She does not even know his identity. General Statutes § 17a-112
(3)(j)(A) and (D) respectively.
 IV
CT Page 14342 REQUIRED FINDINGS
1. Appropriate and timely services were provided to Lorie for at least four years prior to Chloe's birth. Those services included substance abuse evaluation and drug treatment, visitation coordination and case management services. Lorie was, and is, unable to benefit from these services. No services were offered to the biological father since his identity is unknown.
2. The court finds by clear and convincing evidence that DCF has made reasonable efforts to reunify Lorie with Chloe, given the situation and circumstances, as far as possible. Lorie has been unable to rehabilitate herself Due to the unknown identity of the father, DCF was unable to make any efforts to reunify Chloe with him.
3. DCF set reasonable and realistic goals embodied in the specific steps set forth with the filing of these coterminous petitions. Lorie was unable to fulfill them.
4. Chloe interacted with Lorie during visits that took place during the first four months of her life. Her last interaction with Lorie was during Dr. Mantell's assessment of the parent child relationship. There is no evidence of a parent child bond. There is evidence, however, that Chloe is connected and bonded to her foster parents.
5. Chloe is fourteen months old. She was born on August 2000.
6. The court finds that Lorie has made no efforts to maintain contact with Chloe. She has been unable to adjust her circumstances to make Chloe's return to her an option in the foreseeable future, given Chloe's own needs for permanency and stability of care. The father, of course, has not even stepped forward to acknowledge his daughter.
7. No inappropriate conduct is noted on the part of DCF or anyone so as to prevent Lorie from having a meaningful relationship with Chloe. Certainly, no inappropriate conduct on the part of DCF is noted regarding the unknown father.
 V DISPOSITION
Chloe has spent all of her life in foster care. She is in need of permanency. If Lorie were to seriously attempt to deal with her significant drug dependency issues, she would require a substantial CT Page 14343 period of time to meaningfully engage in the recovery process. There is no reasonable basis to believe that giving her additional time would be in Chloe's best interest. There is also no reasonable basis to believe that even if Chloe's biological father were to come forward, he would be in a position to care for Chloe.
The court concludes, based on clear and convincing evidence, that termination is in Chloe's best interests. Accordingly, a termination of the parental rights of Lorie P. and John Doe is ordered. The Commissioner of the Department of Children and Families is hereby appointed statutory parent for the purpose of securing an adoptive family and permanent placement for Chloe. The Commissioner shall file a report with the court within thirty days. Said report shall comply with State and Federal law.
Carmen L. Lopez, Judge Child Protection Session